Turley, J.
delivered the opinion of the court.
Alanson Trigg, tbe complainant, on the 3d day of September, 1833, sold and conveyed by deed in fee simple a tract of land, situated in tbe county of Madison, containing six hundred and forty acres, to tbe defendant, Thomas Read, for the consideration of three thousand three hundred dollars, to be paid in two annual instalments, one due on the 25th day of December, 1834, the other on the 25th of December, 1835. Immediately upon tbe sale, defendant went into possession, and in February, 1835, paid seven hundred and sixty dollars, part of the purchase money.
On the 16th day of May, 1825, William Trigg purchased the *530 tract of land, which is the subject of controversy in this case, from the Cumberland Steamboat Company, and received from it a deed in fee. This purchase was made in part by William Trigg, for himself and his brother Alanson, the present complainant.
On the 10th day of July, 1827, W. Trigg executed to his brother Alanson a deed of relinquishment to one half of the land thus purchased from the Cumberland Steamboat Company, having at a date previous thereto covenanted to convey by deed in fee simple the other half to Alanson Trigg, senior, the father of the said William and Alanson, junior!
On the 5th day of December, 1826, Alanson Trigg, senior, máde and published his last will and testament, by which he devised the half of the tract of six hundred and forty acres thus purchased and covenanted to be conveyed from his son William to his son James, and appointed his son William one of his executors, who proved the will and took upon himself the burthen of its execution.
On the 24th day of May, 1833, James Trigg conveyed, by deed of bargain and sale in fee simple, the three hundred and twenty acres (bequeathed to him by his father, A.Trigg, sen’r.) to his brother A. Trigg, junior: his deed was executed to perfect a contract to convey, entered into between the said James Trigg and Alanson, senior, in the month of August, 1827, from which date Alanson has been in uninterrupted possession of the premises, either by himself personally or by those claiming under him. His title then at the date of his sale to the defendant was supported by the following muniments: a deed of relinquishment for the one half of the premises from his brother William; a deed for the other half from his brother James, who claimed as devisee under his father’s will, and a bond from William Trigg to the devisor for the conveyance of the legal title to that half, and an uninterrupted possession of more than seven years without any suit at law or equity to disturb that possession on the part of William Trigg or others claiming through or under him. But there were none of these evidences of title recorded, and the bond from William Trigg to Alanson Trigg, sen’r. was mislaid; the consequence of which was that the defendant Read *531 became apprehensive that his title, as acquired by his purchase from' Alanson Trigg, senfi'. was defective, and refused to make further payments of the purchase money. The complainant either was or affected to be equally apprehensive of the invalidity of his title to the one half of the land, as obtained through his purchase from James Trigg; and availing himself of the fears of the defendant, which fears, we think we are warranted from. the proof in saying, he ^stimulated and increased. He procured from him a contract' oh the 5th day of July, 1835, agreeing to a recession of the contract of purchase of the 3rd of September, 1833.
This contract of recission is executory, and this suit is commenced to enforce its specific execution.
It appears from the proof in the case, that during the period of time which elapsed from the date of sale in 1833, to the date of the contract of recession in 1835, the land had appreciated in value to, nearly one hundred per cent; that the defendant was evidently anxious to retain his contract, and with great reluctance agreed to rescind it; that he did so in ignorance of the fact that a bond for the conveyance of the title of one half of the land had been executed by William Trigg, sen’r. and also in ignorance of the fact that the title of Alanson Trigg, sen’r. had been perfected under the operations of the statute of limitations by seven years possession under the title of James Trigg, devisee of Alanson Trigg, senior.
It also appears, as we think, that the complainant, though not entirely certain of the validity of his~title as against William Trigg’s heirs, yet had such confidence in it, that he was anxious to have his contract of sale rescinded; that in order to effectuate that purpose he withheld from the defendant the knowledge of the facts upon which his title rested, and induced him to believe that if he did not rescind' he would find great difficulty in enforcing his remedy against him upon his covenant of warranty; and to remove this embarrassment, was instrumental in procuring an action of ejectment to be instituted on the part of the heirs of W. Trigg against the defendant, which he had no means of defending, the sole evidence of title being exclusively in the possession of the complainant, and a knowledge of *532 the facts would make that title available confined to himself and never communicated to the defendant. The consequence was, that a judgment whs rendered against him for the whole sis hundred and forty acres, upon which a writ of possession had been issued, and the defendant was hourly in danger of being-turned out of possession, and left to his remedy upon a covenant of warranty, and with the threat of the complainant that in the event of an attempt to enforce it, he would be under the necessity of following him to Texas, whither he designed removing himself, without giving the defendant an opportunity of serving process upon him in Tennessee.
In ten days after the contract of recision, the complainant filed a bill against the heirs of William Trigg, enjoining the execution of the writ of possession in the action of ejectment against the defendant and prays a, devestiture of title. This bill sets forth a perfect legal title on the part of the complainant, to the whole of the land; and during the pendency of the suit, the bond from William Trigg to Alanson Trigg, senior, which had been mislaid, was found, and there was no difficulty whatever in procuring a decree of devestiture from the heirs of William Trigg.
Upon ascertaining these facts, the defendant refused to execute his contract of recision; and the question now is, whether, under all the circumstances, the complainant has the right to force him by a decree in chancery.
That the defendant had a good title to the land in controversy, both in law and equity, and that he agreed to rescind the contract by which he acquired it, through ignorance and mistake, is not questioned; and the only subject for our consideration is, whether the ignorance and mistake be of such a character as vitiates the contract of recision and excuses him from executing it.
As a general principle, agreements entered into in good faith under ignorance and mistake of law, are held valid and obligatory upon the parties. Ignorantia legis neminem excusat. If this were not so, there would be no saying to what extent the excuse of ignorance might not be carried; and if upon the mere ground of ignorance of the law men were permitted to *533 overhaul or extinguish their most solemn contracts, there would be much embarrassing litigation in all judicial tribunals, and no small danger of injustice from the nature and difficulty of the proof.
But the general principle, thatan act done or contract made under a mistake or ignorance of a material fact is voidable and relievable in equity, is well settled.
The perplexity in the application of these principles always arises out of the difficulty in determining whether the ignorance or mistake has been of law or fact, and this is peculiarly so in the class of cases where the party has acted under a misconception or ignorance of his title to the property, respecting which some agreement has been made or conveyance executed.
This ignorance or mistake is of two kinds: 1st. Ignorance in point of fact of any title in the party. 2nd. All the facts being known, ignorance or mistake of the law in application thereto.
The latter proposition will be examined first, as opening the way to a more complete comprehension of the former.
All the facts being known, when and how does ignorance or mistake of the law as applicable to the right, vitiate a contract relative thereto? The cases upon this point are not easily reconcilable. Indeed it is a question possessing much intrinsic difficulty.
Mr. Story, in his treatise on Equity Jurisprudence, sec. 120, says: “Upon a close survey many, though not all, of the cases uppn this point will be found to have turned, not upon the consideration of a mere mistake of law, stripped of all other circumstances, but upon an admixture of other ingredients, going to establish misrepresentation, imposition, undue confidence, undue influence, mental imbecility, or that sort of surprise which equity uniformly regards as a just foundation for relief.” In the case of Hunt vs. Rousmanier's adm'r. 1 Peters, page 15, the Supreme Court of the United States says: “We hold, that mistake arising from ignorance of law is no ground for reforming a ^■deed founded on such mistake; and whatever exceptions there may be to this rule, they are not-only few in number, but they will be found to have something peculiar in their character.” In the case of the Bank of the United States vs. Daniel, 12 Pet. *534 32, the question, whether a mistake of law, stripped of all other .circumstances, was relievable in equity, was directly presented and determined in the negative. Such is the language of the court: “Vexed as the question formerly was, and delicate.as it now is, from the confusion in which numerous and conflicting decisions have involved it, no discussion of course can be gone into without hazarding the introduction of exceptions that will be likely to sap the correct principle we intend to apply. Indeed, the remedial power claimed by courts of chancery to relieve against mistakes of law, is a doctrine rather grounded upon exceptions, than upon established rules.” To this course of adjudication we are unwilling to yield. That mere mistakes of law are not remediable is well established, as was determined by the court in Hunt vs. Rousmanier’s adm’r. and we can only repeat what was then said; that whatever exceptions there may be to the rule, they will be found to be few in number, and to have something peculiar in their character and to involve other elements of decision.”
On the contrary, it has been held in England as unquestionable doctrine, “that if a party acting in ignorance of a plain and settled principle of law, is induced to give up a portion of his indisputable property to another under the name of a compromise, a court of equity will relieve him from the effect of his mistake.” Nayler vs. Winch, 1 Sim. & Steu. 555. But where a doubtful question arises, such as a question respecting the construction of a will, a different rule prevails: and a compromise fairly entered into with due deliberation, will be upheld in a court of equity, as reasonable in itself to terminate the differences by dividing the estate and as supported by public policy. 1 Ves. 126; 2 Jacb. & Walk. 205; 2 B. & Beat. 180.
In commenting upon these propositions, Mr. Story, in his treatise upon Equity Jurisprudence, sec. 126, says: “The distinction between cases of mistake of a plain and settled principle of law, and cases of a mistake of a principle of law not plain to persons generally, but which is yet constructively certain as a foundation of title, is not of itself very intelligible, or, practicallly speaking, very easy of application, considered as an independent element of decision. In contemplation of law, *535 all its rules and principles are deemed certain, although they have not as yet been recognized by public adjudication. This doctrine proceeds upon the theoretical ground, that id cerium est, quod cerium reddi fotest; and that decisions do not make the law, but only promulgate it. Resides, what are to be deemed plain and settled principles? are they such as have been long and uniformly established by adjudications only? or is a single decision sufficient? What degree of clearness constitutes the line of demarcation? If there have been decisions different ways at different times, which is to prevail? ' If a majority of the profession hold.one doctrine and a minority another, is the rule to be deemed doubtful, or is it to be deemed certain? Take the case of the construction of a will. Every person is presumed to know the law; and though opinions may differ, before an adjudication upon the construction of the will is made; yet, when it is made, it is supposed always to have been certain. It may have been a question at the bar, whether a devise was an estate for life, or in tail, or in fee simple. But when the court has once decided it to be the one or the other, the title is always supposed to have been fixed and certain in the party from the beginning. It will furnish a sufficient title to maintain a bill for the specific performance of a contract of sale of that title.”
These strictures upon the proposition asserted by the English court are, in our opinion, well taken and unanswerable, and they are sustained, as we have seen, by the Supreme Court of the United States.
We therefore think the principle, as settled in the United States, tobe, that an ignorance of the law, however plain and settled the principles may be, and a consequent mistake as to title founded upon such ignorance, furnishes no ground to rescind agreements or to set aside solemn acts of the parties, when they have been made with a full knowledge of the facts, unless they be tainted by imposition, misrepresentation, undue influence, misplaced confidence, or suspicion.
Such is the law when the party acts with a knowledge of the facts constituting his right or title.
But we have now to enquirq how it is when he acts in igno *536 ranee of the fact of bis having any right or title, or in ignorance of any material fact constituting or affecting the same.
Mr. Story, in.his Equity Jurisprudence, section 122, says: “where the party acts upon the misapprehension that he has no title at all in the property, it seems to involve in some measure a mistake of fact — that is, of the fact of ownership, arising from a mistake of law. A party can hardly be said to intend to part with a right or title, of whose existence he is wholly ignorant; and if he does not so intend, a court of equity will in ordinary cases relieve him from the legal effect of instruments which surrender such unsuspected right or title.” In illustration of the principle, he refers to the case of Turner vs. Turner, 2 Rep. in Chan. 81. That case was this: “The plaintiff’s father had left a sum on mortgage to A, who had mortgaged lands to the father and his heirs, with a proviso, that on the payment of the money to the father or his heirs, the premises were to be conveyed to A. The plaintiff was the executor of his father, and claimed the mortgage as vesting in the executor, and not in the heirs. The defendant was the son and heir at law of the plaintiff’s elder brother, and set up a release of this mortgage, and an allotment of it to him upon an agreement made among the heirs for a division of the personal estate and subsequent receipt of the mortgage by him. The plaintiff insisted, that at the time of the release he looked on the mortgage as belonging to the defendant, as heir at law, and knew not his own title thereto, and that the mortgage was worth ¿£8,000 and the shares on division only ¿£250 apiece. The Lord Chancellor (Nottingham) relieved the plaintiff.”
This case is now referred to, not so much for the case itself, as for the observations of the commentator, Mr. Story, upon it. He says: “It is reported without any statement of the grounds of the decision, so that it is impossible now to ascertain them. There may have been surprise or imposition, or undue influence, or the defendant may have well known the plaintiff’s rights and suppressed his own knowledge of them. If it proceeded upon the naked ground of a mistake of law, it is not easily reconcilable with other cases. But if it proceeded upon the ground that the plaintiff bad no knowledge of hi.s title to the *537 mortgage, and therefore did not intend to release any title to it, the release might well be relieved against, as going beyond the , intention of the parties, upon a mutual mistake of law. It might then be deemed in some sort a mistake of fact, as well as of law.” From this it is seen that, that able jurist draws a distinction (a reasonable one and supported by authority) between an agreement made in ignorance of the fact of the existence of a right or title, and ignorance of the true legal construction of the right or title. The same commentator, in sec. 130 of the above work, says: “There may be a solid ground for a distinction between cases, where a party acts or agrees in ignorance of any title in himself, or upon the supposition of a clear title in another, and cases where there is a doubt or controversy or litigation between the parties as to their respective rights. In the former cases, the party seems to labor in some sort under a mistake of fact, as well as of law. He supposes, as matter of fact he has no title, and that the other party has a title to the property. He does not intend to release or surrender his title, but the act or agreement proceeds upon the supposition that he has none.”
In the case of Cann vs. Cann, 1 P. W. 727, Lord Macclesfield is- reported to have said, “that if the party releasing is ignorant of his legal right to the estate, or if his right is concealed from him by the person to whom the release is made, there would be good reason for setting aside the release.”
In the case of Stokely vs. Stokely, 1 V. & Beams, 31, Lord Eldon seems to have thought that there might be a distinction between cases where there is a doübt raised between the parties as to their rights, and a compromise is made upon the footing of that doubt, and cases where the parties act upon a supposition of right in one of the parties without a doubt upon it. The former might be held obligatory when the latter ought not to be; but his lordship admitted that-the doctrine altributéd to Lord Macclesfield was otherwise. Mr. Story, in commenting upon this' case, sec. 129, Equity Jurisprudence, says: “It may be gathered from these remarks, that Lord Eldon’s own opinion was, that an agreement made or act done, not upon a doubt of title, but upon ignorance of any title in the party, ought not to *538 be obligatory upon him, though arising solely from a mistake of law.”
If this great chancery lawyer thought that a legal misconstruction of a party’s title, he having knowledge of the existence of it, by which he is induced to part from it, ought not to be obligatory upon him, how much stronger would have been his opinion in favor of one who had thus parted from his rights without a knowledge of its existence in point of fact, and not upon a legal misconstruction of it?
In the case of Lang vs. The Bank of the United States, Mr. Chief Justice Shippen, in speaking of the effect of mistake of right of a party and- that he was not bound by it, said: “the case of Penn vs. Lord Baltimore is decisive upon this point. I was present at the argument, and heard Lord Hardwicke say, though it is not mentioned in the report, that if Lord Baltimore had made the agreement in question under a mistake of his right to another degree of latitude, he ought to be relieved, but that he was not mistaken.”
• This doctrine is so consonant with reason; and a contrary one would be so monstrous in its consequences, that it is strange there should be any controversy about it. In point of fact, when it is properly understood we think there is none.
A tenant for years sells his interest in the premises; the re-versioner or remainderman has previously died, bequeathing bim the fee, or has conveyed to him by reléase; of which facts he is ignorant at the time of his contract of sale. Shall the purchaser acquire the fee? Surely not: for the parties contracted for the term, and in mutual ignorance that it had been previously vested with the fee. And so, vice versa, if the vendee had bought the fee, believing it to be vested in the vendor, and it turns out that the vendor’s interest is but for a term of years, the vendor shall be relieved.
Such is the law, when the contract is made in ignorance of the existence of any right or title in the party. So it is, if it be made with the knowledge of the existence of some right or title, but in ignorance of any material fact affecting the nature or value of this right or title, essential to the character of the contract, and an efficient cause in its concoction.
*539 The case of Pusey vs. Desbouvrie, 3 Peer W. 315, was this: “The daughter of a freeman of London had a legacy of ten thousand pounds left her by her father’s will, upon condition that she should release her orphanage share, and after her father’s death she accepted the legacy and executed the release. Upon a bill filed afterwards by her against her brother, who was the executor, the release was set aside, and she was restored to her orphanage share, which amounted to ¿£40,000. Lord Chancellor Talbot, in making the decree, admitted that there was no fraud in her brother, who had told her that she was entitled to her election to take an account of her father’s personal estate, and to claim her orphanage share; but she chose to accept the legacy. His lordship said: “it is true, "it appears the son of the defendant did inform the daughter that she was bound either to waive the legacy or orphanage part. But I hardly think that she knew that she was entitled to have an account taken of the personal estate of her father, and first to know what her orphanage part did amount to, and that when she should be fully apprised of this, and not till then, she was to make her election; which very much alters the case; for probably she would not have elected to accept her legacy, had she known or been informed what her orphanage share amounted to before she waived it and accepted the legacy.”
The release in this case was set aside, manifestly upon the groynd, that it had been executed in ignorance of the amount of the orphanage'share; the complainant would have been entitled to it if she had not elected to receive the legacy. And so Mr. Story says in his comments upon the case, sec. 118, Eq. Jurisprudence, “that the decision of his Lordship rested upon mixed considerations, and not exclusively upon mere mistake or ignorance of the law by the daughter;” but, “upon a far more weighty reason, that she acted under ignorance of facts.; for she neither knew, nor had any means of knowing what her orphanage share was when she made her election. It was, therefore, a clear case of surprise in matters of fact as well as of law.”
In the case of McCarty vs. Decaix, 2d Russ. & Mylne, 614, Lord Chancellor Brougham held, that “when a husband re *540 nounced his title to his wife’s property, from whom he had been divorced, under a mistake in point of law, that the divorce was valid and he had no longer any title to her property; and under a mistake of fact, as to the amount of the property renounced, the information respecting which the other party knew and withheld, he was entitled to relief.”
Mr. Story, sec. 140, Eq. Juris, says: “The general rule is, that an act done, or con tract made under a mistake or ignorance of material fact, is voidable and relievable in equity.” And that the “rule applies not only to cases where there has been a studied suppression or concealment of the facts by. the other-side, which would amount to fraud, but also to many cases of innocent ignorance and mistake on both sides,” for which he cites numerous authorities. But he says, sec. 141: “this rule as to ignorance or mistake of facts entitling the party to relief, has the important qualification, that the fact must be material to the act or contract, that is, that it must be essential to its character, and an efficient cause of its concoction. F or though there may be an accidental ignorance or mistake of a fact, yet if the act or contract is not materially affected by it, the party claiming relief will be denied it.” This distinction he illustrates by a familiar case: “A buys land of B, to which the latter is supposed to have an unquestionable title. It turns out upon due investigation of the facts, unknown at the time to both parties, that B has no title, (as if there was a nearer heir than B, who was supposed to be dead, but is in fact living,) in such case equity would relieve the purchaser and rescind the contract. But suppose A was to sell an estate to B, whose location was well known to each, and they mutually believed it to contain twenty acres, and in point of fact it contained only nineteen acres and three fourths of an acre, and the difference would not have varied the. purchase in view of either party; in such case the mistake would not be aground to rescind the contract.” So if one person sell a messuage to another, which was at the time swept away by a flood, or destroyed by an earthquake, without any knowledge of the fact by either party a Court of Equity would relieve. So if a purchaser should buy the interest of the vendor in a remainder in fee, expectant upon an *541 estáte tail, and the tenant intail had at the time, unknown to both parties, actually suffered a recovery, and this bound the estate in remainder, a Court of Equity would relieve the purchaser, purely upon the ground of mistake. So if a life estate should be sold, and at the time of the sale, the estate has been determined by the death of the miter vie, the person for whose life it was held, and the fact is unknown to the parties, a Court of Equity will rescind the contract. So if one purchase a house, and it is burnt down at the time of the purchase, the fact being unknown. So if one buy a horse, supposed to be alive, but he is in fact dead, a Court of Chancery will relieve by rescinding the.contract, if the money be not paid, and if it be paid, by decreeing it to be repaid.” Story’s Eq. Juris, sec. 141, 142,143, and the cases there cited. These are all cases of relief, granted to the vendee, when from ignorance of facts existing at the time of his contract, he has not obtained what he contracted for. But there is nothing which constitutes a vendee a greater favorite in a Court of Chancery than a vendor: reverse their situations, that is, let the contract be of such a character, that owing to ignorance of material facts affecting the vendor’s right or title at the time of the contract, the contract has been so made as to give the vendee a greater interest than was contemplated to be sold, and the same relief, and upon the same principles will be extended to the vendor.
But it is to be observed, that it is not, however, sufficient in all cases to give the party relief that the fact is material, but it must also be such as he could not by reasonable diligence get knowledge of when put upon inquiry. For if by such reasonable diligence he could ha^e obtained knowledge of the fact, equity will not relieve him, since that would be to encourage culpable negligence; neither will relief be extended to the vendor on account of his ignorance, of some secret intrinsic value belonging to the property sold, and which may have been in possession of the vendee, and not communicated by him; as if A, knowing that there is a mine in the land of B, of which he knows that B is ignorant, should buy the land without disclosing the fact to B, for a price in which the mine is not taken into consideration, A would not be entitled to relief, because they *542 have traded at arms-Iength. B is supposed to know the value and qualities of his own property, and if A, by superior skill or diligence, has ascertained that it possesses a secret value unknown to B, there is nothing in the latter which requires him, if he occupy no other relation to A than that of vend'ee, to make the discovery. But as we shall see in the further progress of the examination of this case, if the contract made under such circumstances be executory a Court of Chancery will not decree a specific performance of it.
Such is the law when the ignorance is material; much clearer is it where the existence or non-existence of the fact, as the case may be, is within the knowledge of the person who will be benefited thereby, and he withholds it from ihe person to be injured. This is direct fraud, and a contract thus obtained would be set aside, without doubt or difficulty, at all times. The result may be summed up in the words of Mr. Story: “A mistake or ignorance of facts in parties, is a proper subject of relief, only when'it constitutes a material ingredient in the contract of the parties, and diappoints their intentions by a mutual error, or where it is inconsistent with good faith, and proceeds from a violation of the obligations which are imposed by law upon the conscience of either party. But when such party is equally innocent, and there is no concealment of facts, which the other party has a right to know, and no surprise or imposition, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference, it is strictly damnum absque injuria.” Story’s Eq. Jus. sec. 151. The general results of this examination of the principles and authorities upon which the power of a Court of Chancery to rescind contracts executed by mistake rests, are,
1st. If the contract be made with a full knowledge of all the necessary and material facts, no error arising out of ignorance or mistake of the law in relation to the rights or titles of the parties contracting, unaccompanied with circumstances, either of imposition, misrepresentation, concealment, undue influence, misplaced confidence, or surprise, can constitute a ground for rescinding and setting aside the contract.
2d. If a contract be made in ignorance of the fact of a right *543 or title in vendor, the legal construction of which divests him of that right or title, it will be declared void, and rescinded.
3d. If the contract be made upon the knowledge of some night or title in the vendor, but in ignorance of some fact which makes that right or title greater or less than was supposed by the contracting parties, it will, upon the application of the one party or the other as their interest may be affected, be vacated and rescinded. . ^
4th. If the knowledge of the fact .be in the possession of the party to be benefitted thereby, the withholding it is a fraud, which will of itself vitiate and avoid the contract in a Court of Equity.
The cases of compromises of doubtful rights and contracts, settling family disputes, of which something more will be said anon, appears to be somewhat more favored (especially the latter) than ordinary contracts of purchase. In relation to this subject, we have seen that Lord Macclesfield, in the case of Gann vs. Cam, said: “If a party releasing is ignorant of his right to the estate, or if his right is concealed from him by the person to whom he releases, there would be good reason for setting aside the release.” But he adds: “The mere fact, that the party making the release had the right, and was controverting it with the other party, can furnish no ground to set aside the release; for by the same reason there would be no such thing as compromising a suit, nor room for any accommodation. Every release supposes the party making it to have a right.” Mr. Story, commenting upon this, sec. 131, Eq. Juris., says: “The whole doctrine of the validity of compromises of doubtful rights rests on this foundation. If such compromises are otherwise unobjectionable, they will be binding, and the right will not prevail against the agreement of the parties, for the right must always be on one side or the other, and there would be an end of compromises, if they might be overthrown upon any subsequent ascertainment of right contrary thereto. If, therefore, a compromise of a doubtful right is fairly made between parties, its validity cannot depend upon any future adjudication of that right. And where compromises of this sort are fairly entered into, whether the uncertainty rests upon a doubt of fact, or a *544 doubt in point of law, if both parties are in the same ignorance, the compromise is equally binding, and cannot be affected by any subsequent investigation and result. But if the parties are not mutually ignorant, the case admits of a very different consideration, whether the ignorance be of a matter of fact or law.” But this principle applies only, when the doubts and difficulties, whether of law or fact, are in connection with the rights supposed to be in controversy, and about which the compromise is made. For the same commentator in continuance observes: “It has been emphatically said, that no man can doubt, that the Court of Chancery will never hold parties, acting upon their rights, to be bound, unless they act with full knowledge of all the doubts and difficulties that do arise. But if parties will, with full knowledge, act upon them, though it turns out that one gains an advantage from a mistake in point of law, yet if the agreement was reasonable and fair at the time, it shall be binding. And transactions are not in the eyes of a Court of Equity, to be treated as binding even as family arrangements, where the doubts existing, as to the rights alledged to be compromised, are not presented to the mind of the interested.” Gibbons vs. Caunt, 4 Vesey R. 849: Dunnage vs. Whyte, 1st Swanst. R. 137: Henly vs. Cook, 4 Russ. R. 34.
Therefore, although as we have seen it was held in England as unquestionable doctrine in cases'of ordinary contracts, that if a party acting in ignorance of a plain and settled principle of law, is induced to give up a part of his indisputable property to another, a Court of Chancery will relieve him; yet in the case of a compromise of a doubtful right, if the compromise be fairly made in mistake of the law as applicable to that doubt, the compromise is binding. In illustration. If it be doubtful, in the construction of a will, or deed, whether the words “heirs of the body,” “issue,” “children,” be words of limitation, or words of purchase, and a compromise be made, by which either a life estate, or an absolute estate be granted to devisee or ven-dee, as the fair construction of the will or deed, this compromise shall be binding upon the parties, though the true legal construction of the instrument be different, but this compromise does not affect any right the parties may have from any other *545 source, and is only obligatory so far as the construction of the instrument is involved; therefore, though a release may have been executed under this construction, yet if either party have right or title to the property paramount to the will or deed, and is in ignorance of it, this right is not affected by the release. So it is, if the right compromised be doubtful in point of fact, no other fact than that upon which the doubt is supposed to rest, and which is presented for compromise, is precluded by the compromise. As if the party claims as heir at law, and it be doubtful if he be the heir at law, and in case of this doubt he compromise his right; yet if it turn out that, though not heir at law, he is devisee of the property, his right as devisee is not compromised. So if he compromise upon the mistaken apprehension that he is or is not devisee, but it turns out that he is entitled as heir at law, his right as heir at law is not compromised.
In the cases of family compromises, all that need be said here is, that agreements affecting them are upheld with a strong hand, and an equity has been administered in regard to them, which has not been applied to agreements generally, upon the ground, that the honor and peace of families make it just and proper so to do.
Let us now proceed to the application of the principles of law, which we have attempted thus to extract, to the case under consideration.
The defendant purchased from the complainant a tract of .land, which was conveyed to him by deed of bargain and sale with general warranty — he enters into possession — he has acquired the complete legal title. But it subsequently appears, that defendant become alarmed in relation thereto, and being much harassed by the position in which he was placed by the conduct of the complainant (which, to say the least of it, is of a suspicious character, and tending to show that he was dersious of forcing the defendant into a rescission of the contract of sale between them, the land having risen greatly in value,) and believing that the complainant had no title to one-half of the land sold to him, he very reluctantly agrees to rescind the contract. In a very short time after this contract of rescission, the com *546 plainant files a bill for a specific performance, setting forth a substantial legal title, and obtained a decree for the same. So that it turns out that at the time the complainant and defendant agreed to rescind their contract, upon the supposed want of title in the complainant, he was not only the legal owner of the one-half, but the clear equitable and legal owner of the other half, which fact was at least unknown to the defendant. This ignorance caused the defendant to make the contract, and which, if it had been removed, he never would have enteved into, and which he has refused to execute ever since. Now, is he to be bound by this contract, in “equity and good conscience”?
That this agreement was made in ignorance by the defendant, is not disputed. That it would not have been made but under this ignorance, is manifest.
What is the nature and character of this ignorance? Is it ignorance of law or ignorance of fact? Clearly, in our opinion, ignorance of fact. What fact? The fact, that the complainant was the owner of the moiety of the estate claimed through his brother James.
The defendant was acting upon the mistaken supposition, that there was no written contract between William Trigg and Alanson, Sen., and that no title had passed from William; and in ignorance, that complainant’s right thereto had been perfected by the statute of limitations. If there had been a knowledge of the existence of the facts, and the parties had acted upon the belief, that they constituted no obligatory right, either in ignorance that a Court of Chancery would specifically decree the contract against William, or under the belief that the possession was not protected under the statute of limitations, it would have been a mistake of law, and not of fact.
The mistake being one of fact, is it of such a character, as vitiates the agreement in the estimation of a Court of Chancery? Assuredly it is; for it is of the very essence of the agreement; the very cause and foundation of it, and without which it would •never have had existence, being in the words of Mr. Story, “essential to its character, and an efficient cause of its concoction,”
But this is not all: this ignorance of fact does not appear to *547 have been mutual ighorance upon the part of the complainant and defendant. Granting that there was mutual ignorance of the actual existence of the bond at the time, which, it is by no means sure, is not granting too much; yet the complainant must have had reason to believe, that the bond had existence, and had only been lost or mislaid, which information ought to have' been communicated to the defendant; and he must also have known of his claim under the will of Alanson Trigg, Sen., and of his seven years possession, which does not appear to have been communicated to the defendant. The withholdr ing the knowledge of these facts, so material to a full comprehension of his rights by the defendant, and so necessary for his proper action upon them, was mala Jides, such as vitiates a contract.
Can the contract be sustained, as having been made in relation to conflicting and doubtful rights? We think not.
1st. It is not a compromise of conflicting and doubtful rights. Compromises of this character are, where the parties both claim right or title to the property in dispute, and the compromise is ndade in reference to that right; here there is no such contest, the rights of the parties to the agreement are certain and without conflict; the only doubt and uncertainty being, as to the rights of one of the parties, ánd a third person.
Whatever title the complainant had, whether in law or equity, it was certain belonged to the defendant. It was equally certain, that if the complainant had no title to the premises sold to'the defendant, that he was responsible to him upon his warranty. So the agreement was not to compromise a right, but to rescind a contract, which purported to convey a right which was believed. not to exist, and to place the parties in statu quo. If an agreement had been made upon the subject, between the defendant and William Trigg’s heirs, it would have been a case of compromise of conflicting and doubtful rights, in as much as both parties claimed title to the land.
2d. But if it could be considered as a case of compromise, it was made upon the supposition that there was no title in the complainant, and in entire ignorance of the existence , of the *548 bond and the adverse possession of seven years, and without relation to these facts.
3d. Important information was in possession of the complainant upon the subject which was withheld. Fraud vitiates a compromise as well as contracts of obligation and sale.
All the remarks heretofore made, are made as if the agreement to rescind had been executed, and for the purpose of showing that a Court of Chancery would under all the circumstances annul and set aside, as having been obtained in bad faith, and sustained in violation of equity.
But much stronger is the case than this: the contract to rescind is executory, and not executed, and the complainant comes asking the aid of the court to enforce it.
The power of a Court of Chancery to execute contracts specifically, is of a very ancient origin, and the principles upon which it is exercised are well understood and settled. It rests upon the ground, that there are many cases in which a compensation in damages will be no adequate remuneration for a violation of contract, and that a failure to perform it is a breach of moral and equitable duty; and a Court of Chancery, addressing itself to the conscience of the offending party, requires a strict performance of what he cannot without manifest wrong or fraud refuse.
Mr. Story in speaking of the power of a Court of Chancery to rescind, cancel, or direct a surrender of contracts, securities or deeds, or to enforce them by a specific performance, sec. 693, Eq. Juris., says: “The application to a Court of Equity for either of the purposes, is not, strictly speaking, a matter of absolute right, upon which the court is bound to pass a final decree, but it is a matter of sound discretion to be exercised by the court, either in granting or in refusing the relief prayed according to its own notion of what is reasonable and proper under all the circumstances of the particular case. Thus for instance: A Court of Chancery will some times refuse to decree a specific performance of an agreement, which it will yet decline to order to be delivered up, cancelled or rescinded. On the other hand a specific performance will be decreed upon the application of one party, when it would be denied upon the ap *549 plication of the other. And an agreement will be rescinded or cancelled upon the application of one party, when the court would decline any interference at the instance of the other. So that we are to understand, that the interference of a Court of Equity is a matter of mere discretion, not, indeed, of arbitrary and capricious discretion, but of sound and reasonable discretion, secundum arbitrium loni judicis.” 17 Ves. 167: 18 Yes. 335: 16 Ves. 305, 308: 18 Ves. 12: 3 Atkins, 188: 18 Ves. 111. In sec. 762 of the same work, he says: “In truth, the exercise of this whole branch of Equity Jurisprudence, respecting the rescission and specific performance of contracts is not a matter of right in either party, but is a matter of discretion in the court; not, indeed, arbitrary or capricious discretion, dependent upon the mere pleasure of the judge, but of that sound and reasonable discretion which governs itself, as far as it may by general rules and principles, but at the same time which holds or grants relief according to the circumstances of each particular case, when the rules and principles will not furnish any exact measure of justice between the parties.” In sec. 750, he says: “Courts of Equity will not proceed to decree a specific performance when the contract is founded in fraud, imposition, mistake, undue advantage, or gross misrepresention, or when from a change of circumstances or otherwise it would be unconscientious to enforce it. But that as a general rule the contract will be specifically executed, if it be in writing, is certain, is fair in all its parts — is for an adequate consideration, and is capable of being performed; but otherwise not. In sec. 769 — 70, the same commentator observes: “It is important to take notice of a distinction between the case of a plaintiff seeking a specific performance, and the case of a defendant resisting such performance. We have already seen, that a specific execution of a contract in equity is a matter not of arbitrary right in the party, but of sound discretion in the court. Hence it requires much less strength of case on the part of the defendant to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain a bill to enforce a specific performance. An agreement to be entitled to be carried into specific performance, ought to be certain, fair and just, in all its parts. *550 Courts will not decree a specific performance in cases of fraud or mistake, or of hard and unreasonable bargains, or when the' decree would produce injustice, and generally in any case when such decree would be inequitable under all the circumstances. But Courts of Equity do hot stop here, for they will let the defendant defend himself by evidence to resist a decree, when the plaintiff would not always be permitted to establish his case by the like evidence. Thus for instance: Courts of Equity will allow the defendant to show, that by fraud, accident, or mistake, the things bought are different from whathe intended; or that material terms have been omitted in the agreement; or that there has been a variation of it by parole; or that there has been a. parole discharge. The ground of this doctrine is, that Courts of Chancery, “ought not to be active in enforcing claims, which are not under all the circumstances just as between the parties." See the numerous authorities referred to by Mr. Story, page 79, 80, Eq. Juris.
Mr. Story -in commenting upon the iegal principle, that if one party has actual knowledge of an event or fact from private sources, not then known to the other party from whom he purchases, and which knowledge would materially enhance the value of the thing purchased, or change the intention of the party as to the sale, the contract of the sale will nevertheless be valid, observes: “There are many duties that belong to the class'of imperfect obligations which are binding on conscience, but which human laws do not, and cannot undertake directly to enforce.. But when the act of a Court of Chancery is sought to carry into execution such a contract, then the principles of ethics have a more extensive sway. And a purchase made with such reservation of superior knowledge, would be of too sharp a character to be aided and enforced by a Court of Chancery. It is a rule in equity, that all the material facts must be known to both parties to render the agreement fair and just in all its parts; and it is against all the principles of equity, that one party knowing a material ingredient in an agreement, should be permitted to suppress it, and still call for a special performance.” Story Eq. Juris, sec. '206: 2 Kent Coni. sec. 49, p. *551 490-1, (2ed.): Parker vs. Grant, 1 John. Ch. Rep. 630: Ellord vs. Landoff, 1 B. & Beatt. 230-31.
From this view of the subject, it is obvious that a complainant tobe entitled to a specific performance or execution of his contract, must come with his hands perfectly clean, and his conscience entirely void of offence — that if his contract has been obtained for an inadequate consideration' — that if it has been made by the defendant in ignorance of his right, either as to the law or the facts — that if it have been made in ignorance of facts, changing the nature of the thing sold, which was known to the opposite party, and by him withheld, whether they were of such a character as he was bound by law to disclose or not, in all these cases a specific performance will be refused, and the party left to his remedy at law if he has any.
These principles are, as we think, conclusive against the complainant’s right to relief in the present case.
The defendant involuntarily agrees to rescind a contract by which he had purchased, several years before, the tract ofland in dispute;' he does this, because he believes the complainant has no title thereto; in this he was clearly mistaken, and there is but too much reason to believe the complainant knew that he was in this mistaken. At any event, in a short time after this agreement, complainant by a decree of a Court of Chancery, procures the title, and this upon a bond that was in existence at the time of the agreement, but .unknown to the defendant. The land had appreciated greatly in value between the dates of the purchase and the agreement to rescind. To specifically execute this agreement, will be to benefit the complainant at the expense of the defendant, and without any adequate compensation therefor. There is nothing in the case calculated to make the complainant a favorite in a Court of Chancery, but much to repel him. And to decree in his favor, will be to engraft a new principle upon the law of specific execution of contracts, and to violate principles heretofore considered well settled. .
The bill, therefore, so far as it seeks a specific execution of the contract on the part of the defendant will be dismissed, but in as much as a portion of the purchase money is unpaid, and it appears that the evidences thereof have been cancelled, and *552 that the plaintiff is entitled to the aid of a Court of Chancery under the circumstances to enforce the payment, a decree will be given for the amount due, which shall be a charge upon the land until paid.